UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

CLARK ADAMS

v.                                              CIV NO. 3:06CV1166 (HBF)

YALE-NEW HAVEN HOSPITAL

RULING ON POST-TRIAL MOTIONS

Clark Adams, a male African-American physician's assistant ("P.A."), filed a complaint against Yale-New Haven Hospital, alleging that YNHH discriminated against him on the basis of his race and gender when it awarded a Lead Physician's Assistant position to Rita Rienzo in October 2003. At trial, a jury found in his favor on his gender discrimination claim, the only claim presented to the jury.[1] YNHH then asked the court to set aside the verdict and to enter judgment in its favor notwithstanding the verdict or, in the alternative, to grant the defendant a new trial. For reasons discussed below, defendant's Motion to Set Aside the Verdict and for Judgment Notwithstanding the Verdict and for a New Trial [Doc. #91, 92] is GRANTED IN PART and DENIED IN PART. Defendant's renewed oral motion for directed verdict [Doc. #83] is DENIED AS MOOT.

---

[1] On February 14, 2008, the Court granted defendant's oral motion for directed verdict on plaintiff's Title VII and Connecticut Fair Employment Practices Act claims on the basis of race discrimination and reserved decision on plaintiff's claim of gender discrimination in YNHH's appointment of Rienzo to Lead P.A. [Doc. #82].

1

I.  **STANDARD OF REVIEW**

Under Rule 50(b) of the Federal Rules, of Civil Procedure, the trial court may grant judgment notwithstanding the verdict only where there is "an absence of any substantial evidence to support the verdict." Miceli v. Interressantskapet Sea Transport, 413 F. Supp. 776, 779 n.3 (S.D.N.Y. 1976). Thus, when considering whether to grant judgment notwithstanding the verdict, the court must inquire "whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir. 1970). The court must also assess all inferences and evidence in the light most favorable to the party against whom the motion is made. O'Connor v. Pennsylvania R. Co., 308 F.2d 911, 914 (2d Cir. 1962).

The court does not set aside a jury verdict without having a compelling reason for doing so. In the Second Circuit, the trial judge must set aside the jury verdict when there has been a "miscarriage of justice." Bevevino v. Saydjari, 574 F.2d 676, 684 (2d Cir. 1978). It is the duty of the trial judge to ensure that there has been no such miscarriage of justice. Id.

II.  **FACTS**

Adams is an African-American male who was employed as a Physician Associate/Assistant by YNHH since January 1988. Adams v. Yale-New Haven Hospital, 3:06CV1166 (HBF), 2007 WL 201244, at *2 (D. Conn. Jan. 22, 2007); Tr. Feb. 12, 2008 at 40. In 1999, Adams transferred to the Department of Surgery from the Department of Medicine. Adams, 2007 WL 201244, at *2. In 2002, Adams was one of three P.A.s in the Department of Surgery. Id. The other two P.A.s, Rienzo and Heather Orosco, were both women. Tr. Feb. 12,

2008 at 78, 87. That same year, in order to maintain its accreditation with the American Committee of Graduate Medical Education ("ACGME")[2], YNHH decided to hire more P.A.s and require that all of them, including the existing P.A.s -Adams, Rienzo and Orosco- pull call. Tr. Feb. 18, 2008 at 70, 87. In an August 2002 meeting, Dr. John Seashore, Director of the Surgical Residency Program, asked Adams, Orosco, and Rienzo if they would be amenable to taking call. Id. at 88. Adams testified that he told Dr. Seashore that he was not interested in pulling call. Id. On November 19, 2002, YNHH informed Adams and Rienzo, in writing, that they each had sixty days (60) to agree to the on-call requirements or that they would be terminated from YNHH's employ.[3] Adams, 2007 WL 201244, at 2. Rienzo testified that it was her understanding that she and Adams were given the same options.[4] Tr. Feb. 12, 2008 at 210-14.

On November 21, 2002, Adams filed an internal grievance. Id. In February 2003, this grievance was denied. Id. YNHH reiterated that there would be no exceptions to the on-call

---

[2] Dr. Stahl, the Associate Chief of Surgery at the time, testified that YNHH had been informed that their graduate program risked losing accreditation, whereby they "had to get enough residents to take call and offload – or P.A.'s to take call and offload the residents" or they "would be dead in the water." Tr. Feb. 14, 2008, at 158-59.

[3] The November 19, 2002, letter reads, in pertinent part: "[t]his letter is to inform you that within 60 days, you must agree to all the requirements of the job description, including on-call, or we will have to hire a replacement. We are sorry that this action has become necessary, but the survival of our residency program is dependent on these changes." Tr. Feb. 11, 2008 at 95.

[4] "Q. All right. Do you know whether the same options were provided to Mr. Adams?
  A. [Rienzo] Yes, My understanding is that we were both given the same set of circumstances and the same options.
  Q. All right, and did he [Adams] inform you that he, in fact, got the identical letters that you received?"
  A. Yes.
Tr. Feb. 12, 2008 at 215.

3

requirements. Id. In March 2003, Adams transferred to the Department of Medicine.[5] Id. Also, in March 2003, Orosco submitted a letter of resignation; she left her employment at YNHH in June 2003. Id.

Because the Lead P.A. Position in the Department of Surgery remained vacant, Dr. Stahl solicited Rienzo to take the position. Dr. Stahl testified that,

> [o]f the three P.A.'s, they were starting to bail out on me. You know, Clark left. We needed bodies there to help – you know, qualified people to help. . . . Rita [Rienzo] was the only one left in the department . . . she was the only one left in the group.
>
> Tr. Feb 14, 2008 at 176-77.

The decision to award the Lead P.A. position to Rienzo was made only after both Adams and Orosco had left the Department of Surgery. Dr. Stahl testified that he "reluctantly" agreed to accommodate Rienzo's schedule, so that she would agree to take the open Lead P.A. position. Tr. Feb. 14, 2008 at 177.

## III. **DISCUSSION**

The Civil Rights Act of 1964, Title VII, provides that it shall be an unlawful employment practice for an employer–

> (1) To discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, term, conditions, or privileges or employment, because of such individual's race, color, religion, sex, or national origin.
> (2) To limit, segregate, or classify his employees or applicants for employment in any which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex or national origin.

---

[5] In ruling on summary judgment, the court found that, "[i]n March 2003, Adams was forced to transfer to the Department of Medicine, which did not require on-call for its P.A.'s." As will be discussed infra Part III.C, Adams was only "forced" to transfer due to his own personal choice. He testified that, instead of pulling call, he took a job in the Department of Medicine, which did not require call. Tr. Feb. 12, 2008 at 106.

42 U.S.C. §2000e-2(A).

In this case, Adams claims that YNHH, in appointing Rienzo to the Lead P.A. position in October 2003, intentionally discriminated against him because of his gender. In order for a plaintiff to prevail on a claim for gender discrimination, he must prove, by the preponderance of the evidence, four elements. First, that he was in a protected group. Second, that he was qualified for the position. Third, that he suffered an adverse employment action. Fourth, that gender was a motivating factor in YNHH's decision to take the alleged adverse employment action. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993). The first element is deemed proved as both parties agree that Adams is a member of a protected group.

### A. Adams Was Not Qualified for the Lead P.A. Position

Defendant argues that the court should set aside the jury verdict because there was no evidence from which the jury could have concluded that the plaintiff was qualified and eligible for the Lead P.A. position. [Doc. #93 at 11]. In order to be considered a "qualified," applicant for a position, an employee must be "eligible" for the position. Torrel v. City of New York, 01CIV9895 (DLC), 2003 WL 22335006, at *4 (S.D.N.Y. Oct 14, 2003), aff'd, 114 Fed. Appx. 14 (2d Cir. 2004). See also Simmons v. Security Benefit Group, Inc., CIV A874225S (BNA), 1991 WL 17681, at *8 (D. Kan Jan. 31, 1991) ("Although it is undisputed that plaintiff did apply for the position, **plaintiff has not shown she was qualified for the position** or that she was rejected under circumstances giving rise to an inference of racial discrimination.") (emphasis added); see also Martinez v. Marin Sanitary Services, 349 F. Supp. 2d 1234, 1257 (N.D. Cal. 2004) (defendants met the burden of setting forth a legitimate, nondiscriminatory reason for failure to

5

promote and plaintiff sanitation worker had failed to take required training courses that would have made him eligible to apply for the position).

Here, the defendant contends that, because Adams failed to establish that he was eligible for the Lead P.A. position, the jury could not have reasonably determined that Adams was qualified for the Lead P.A. position awarded to Rienzo in October 2003. Adams never applied for the position. YNHH introduced evidence that under the hospital's job posting policy, a position first must be posted within the relevant department. The position is posted outside the department to the hospital in general only if a departmental candidate does not take the position. [Doc. #93 at 8].

The plaintiff failed to address directly the issue of whether Adams was eligible and therefore qualified for the position. Rather, the plaintiff merely states that Adams was eminently qualified for the Lead P.A. position because he was a long-term employee, had an excellent performance history, and no disciplinary history. [Doc. #108 at 37].

The plaintiff further contends that it "is undisputed that, had [Adams] even been aware of the availability of the newly created position, the defendant could readily have considered him for the position . . . ." [Doc #108 at 38]. But this is argument. The uncontroverted evidence supports defendant's claim that, due to the hospital's job posting policy, Rienzo, the only department candidate, had priority for the Lead P.A. position in the Department of Surgery. Indeed, the plaintiff himself testified that, when the job was first posted, he was not in the Department of Surgery and that he could not apply as a departmental employee.[6] Tr. Feb. 12, 2008 at 122-23.

---

[6] Q. So once you left the Department of Surgery and this Lead P.A. position was posted, you could not apply as a departmental employee, correct?
  A. [Adams] Not as a member of the Department of Surgery.

The court has not been able to identify sufficient evidence, nor has the plaintiff cited to any evidence in the record, to show that Adams, who was not an employee of the Department of Surgery in October 2003, was eligible, and hence qualified, for the position, where an internal candidate was available. The record simply does not provide sufficient evidence for a jury to conclude that Adams was qualified for the Lead P.A. position given that, as discussed above, in order to be qualified for a position, one must also be eligible.

Thus, the court finds that the jury's determination that Adams was qualified for the position is not supported by the record. The court finds no evidentiary basis for the plaintiff's assertion that, "[a]bsent gender discrimination, the plaintiff was eligible for the position." [Doc. #108 at 39]. Because the plaintiff was not a Department of Surgery employee when the position was posted and then awarded to an internal candidate, he was not eligible to apply for the Lead P.A. position, and was therefore not qualified.

### B. YNHH Did Not Act in Secret

The plaintiff repeatedly alleges that the defendant was secretive in when it both created and awarded the Lead P.A. position. ("That the defendant *quietly created* a P.A. position in Surgery for the female Orosco . . . .") [Doc. #108 at 31]; ("the Lead P.A. position was *surreptitiously* given to Rienzo.") [Doc. #108 at 34]; ("That both positions were *surreptitiously created* for the two female P.A.s . . . ."); [Doc. #108 at 36] (emphasis added).

---

Q. Okay, and if someone in the Department of Surgery wanted that job and applied for it within the posting deadline, that person would be entitled to the job over you, before you could even apply for it, correct?
    A. [Adams] If they met the qualifications, I believe that would be correct.
Tr. Feb. 12, 2008 at 122-23.

In a failure to promote case, a secretive selection process may raise an inference of disparate treatment. For instance, in <u>Roberts v. Gadsden Memorial Hosp.,</u> the Eleventh Circuit reiterated the fact "that informal, secretive, and subjective hiring or promotion decision processes tend to facilitate the consideration of impermissible criteria, such as race." 835 F.2d 793, 798 (11th Cir. 1988), <u>Roberts</u>, 835 F.2d at 798. Similarly, in <u>Carmichael v. Birmingham Saw Works</u>, where an employer awarded a position to a white employee with less seniority than the African American, through an informal "word of mouth" procedure, the court underscored, "that such subjective procedures can lead to racial discrimination, both because important information may be available only to whites and because such procedures place no check on individual biases." 738 F.2d 1126, 1133 (11th Cir. 1984).

The alleged evidence of secrecy is insufficient to support the jury's verdict that the plaintiff's gender motivated YNHH's decision to appoint Rienzo, given the evidence that the policy of the department was to give priority to departmental candidates and Mr. Adams was no longer in the department. Dr. Stahl, who negotiated the terms of the position with Rienzo, testified that "[u]nder his understanding of the Job Posting Policy, re-posting the position would have been a meaningless act" [Doc. #93 at 8] because even if he had posted the position, Rienzo would have had "first dibbs on it." Tr. Feb. 14, 2008 at 179. Further undermining the allegation of secrecy is evidence that Mr. Adams was advised before he left the Department of Surgery that a Lead P.A. position was going to be created, and he was encouraged to remain in the department and apply for it.

8

C.     **Adverse Employment Action**

Defendant also argues that the verdict should be set aside because there was no evidence of an adverse employment action taken against Adams because of his gender. To prevail on a Title VII claim, a plaintiff must prove that he suffered an adverse employment action as a result of his employer's discriminatory conduct. Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). There must be a causal link between an employer's discriminatory conduct and the alleged adverse employment action. "A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." Galabya v. New York City Board of Educ., 202 F. 3d 636, 640 (2d Cir. 2000) (citations omitted). To be 'materially adverse', a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities'". Id. A materially adverse change might be indicated by "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Id.

Courts have recognized that, if the alleged adverse employment action is created by the plaintiff's own conduct, then the requirement of an adverse employment action is not satisfied. See Mullins v. Potter, 2005 WL 2396997, at *4 (E.D. Mich. Sept. 28, 2005) (finding no adverse employment action where the Post Office offered Plaintiff the option to work as a 204(B) at the Ann Arbor Post Office or in her hometown of Livonia and Plaintiff chose not accept these transfers and to continue working in Plymouth). Garrett v. Bd. of Trustees of Univ. of Alabama, 354 F. Supp. 2d 1244, 1248 (N.D. Ala. 2005), aff'd, 507 F. 3d 1306 (2007) (holding that a voluntary transfer to a lesser paying position is not an adverse employment action).

9

However, the Second Circuit has recognized that a transfer may, in certain circumstances, constitute an adverse employment action, even if requested by the plaintiff. See Pellier v. British Airways, Plc., 2006 WL 132073 (E.D.N.Y.. Jan. 17, 2006) (citing Richardson v. N.Y. State Dep't of Corr. Servs., 180 F.3d 426, 444 n. 4 (2d Cir.1999)(finding sufficient evidence to support a conclusion that a transfer requested by the plaintiff constituted an adverse employment action where there was evidence that another, more desirable, lateral job opening for which the plaintiff was qualified may have existed but was not offered to the plaintiff)).

Here, Adams left the Department of Surgery for the Department of Medicine in March 2003. Defendant argues that Adams "elected to transfer" to the Department of Medicine, [Doc.#93 at 5], while plaintiff argues that he was "forced" from the Department of Surgery. [Doc. #108 at 30].

The evidence overwhelmingly indicates that Adams made a v*oluntary* move, albeit, from his perspective, under less than ideal circumstances and under protest.[7] [Doc, #109 at 2]. The defendant told Adams, as well as the two female P.A.'s Rienzo and Orosco, that he had three options for long-term employment: stay in the department with a 20% pay raise and the new schedule with call, transfer to another department, or seek other employment. Additionally, Adams was told by Dr. Seashore that there would be a temporary dispensation from the call requirement, and that he could stay in the Department of Surgery, without working the call hours,

---

[7] "Q. All right. Did Dr. Seashore . . . inform you that there would be a temporary dispensation from this requirement, and that you could stay in the Department of Surgery without working the call hours, until such time as the new P.A.'s were onboard? A. [Adams] "Something similar . . . ." Tr. Feb. 12, 2008 at 55.

10

until such time as the new P.A.'s were onboard. Tr. Feb. 12, 2008 at 55. The evidence shows that Adams had options presented to him by the hospital and elected to leave the Department of Surgery. Thus, the court finds that a reasonable jury could not have concluded that Adams suffered an adverse employment action.

Moreover, even if the plaintiff had introduced evidence from which a reasonable jury could conclude that his transfer was involuntary, there is no evidence that the transfer resulted in "significantly diminished material responsibilities, or other indices ... unique to a particular situation." Galabya, 202 F.3d at 640. "'[I]f a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action.'" Fairbrother, 412 F.3d at 56 (quoting Williams, 368 F.3d at 128).

### D. Intent to Discriminate Based on Gender

Defendant finally argues that the verdict should be set aside because there is no evidence that Dr. Stahl was motivated by discrimination against Adams because of his gender. Plaintiff now claims that Dr. Stahl could have considered plaintiff for the Lead P.A. position under the Hospital guidelines but did not because of gender discrimination, specifically a preference for women over the plaintiff, a male. Stated differently, plaintiff is now arguing that the exact position to which Rita Rienzo was promoted, which plaintiff claims was created and tailored to her requirements by Dr. Stahl, based on her gender, was not posted as part of a plan to discriminate in favor of Rita Rienzo on the basis of her gender. However, this evidence could not have been considered by the jury, pursuant to the Court's Charge that, "you [the jury] must

11

determine if plaintiff's gender has a determinative influence on the outcome, that it made a difference in the defendant's decision" [Doc. # 88, at 32]. The jury was instructed to consider whether the hospital made its decision based on the plaintiff's gender, not the Lead P.A.'s gender.

To support the defendant's alleged preference for females, plaintiff's counsel argued in summation and post-trial briefing that a man giving a woman, but not a man, a hug amounts to evidence of gender discrimination. [Doc. #108 at 12]. At trial, outside the presence of the jury, plaintiff observed that Dr. Stahl greeted Rienzo with a hug when she entered the courtroom outside the presence of the jury. Id. He apparently did not hug Adams. According to the plaintiff, "[t]he defendant showed no such physical affection for or fondness for the male plaintiff" which evidenced "[t]he defendant's fondness and preference for females." Id. Counsel's repeated references to the fact that Dr. Stahl gave Ms. Rienzo a hug when she entered the courtroom, without more, cannot be a basis for the jury to conclude that Rienzo's appointment to the position was motivated by discrimination against Adams because he is male.

Apart from the claim about a hug, the plaintiff fails to cite any evidence that Dr. Stahl was, in any way, motivated by gender bias. In fact, Dr. Stahl testified that he was not influenced in any way by Rienzo's gender when he offered her the lead P.A. position.[8] Tr. Feb. 14, 2008 at 179-80. Plaintiff contends that, "[t]he difference in the defendant's treatment of the existing [P.A.'s] regarding the call requirement divides perfectly along gender lines" [Doc. #108 at 30]. The mere fact that Adams is male, while Rienzo is female, does not evidence gender discrimination. "More

---

[8] "Q. Now, when you decided to offer the position to Ms. Rienzo – the position of Lead P.A. to Ms. Rienzo at a time when she was the only one on the ship, as you say, were you, in any way, influenced by her race or her gender? A. No"

Tr. Feb. 14, 2008 at 179-80.

is needed than proof that a qualified male [female] was chosen over a qualified female [male]." Kachel v. City of Pueblo, F. Supp. 749, 755 (D. Colo. 1990), aff'd, 945 F.2d 411 (10th Cir. 1991) (citing Olson v. Philco-Ford, 531 F.2d 474 (10th Cir.1976)). The jury's verdict that the defendant's failure to promote was due to gender discrimination, as framed for the jury, is not supported by the evidence.

IV. **NEW TRIAL**

Although Rule 59 is the traditional procedural vehicle used to grant a new trial, the Court also has discretion to grant a new trial, sua sponte, under Rule 50(b), which provides as follows:

> In ruling on the renewed motion [for judgment as a matter of law], the court may:
>
> (A) allow judgment on the verdict, if the jury returned a verdict;
>
> (B) order a new trial; or
>
> (C) direct the entry of judgment as a matter of law;

Fed.R.Civ.P. 50(b).

Under Rule 50(b), a new trial may only be granted if the moving party would be entitled to judgment as a matter of law. See Goldsmith v. Diamond Shamrock Corp., 767 F.2d 411, 414 (8th Cir. 1985) ("[Rule 50(b)] by its very terms gives a court discretion to order a new trial absent a motion therefor only where the moving party otherwise would have been entitled to judgment notwithstanding the verdict."); Jackson v. Town of Hempstead, No. 98-CV-5635, 2002 WL 199834, at *2 (E.D.N.Y. Feb. 4, 2002) ("The Court may only grant a new trial under Rule 50(b) if the movant satisfies the stricter standard for judgment as a matter of law...."); Newtown v. Shell Oil Co., No. 3:97 CV 0167, 2000 WL 49357, at *2 (D.Conn. Jan. 18, 2000) (noting that new trial under Rule 50(b) is "restricted to those cases in which the standard for granting ... judgment as a

13

matter of law has been met"); 9A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2538 (2d ed.1995) (same).

It is appropriate for a court to exercise its discretion and allow a new trial, even though judgment may have been ordered, where "the interests of justice would be better served by allowing the nonmovant an opportunity to cure its deficiencies of proof." Jackson, 2002 WL 199834, at *2; see also Cone v. West Virginia Pulp & Paper Co., 330 U.S. 212, 215-16 (1947); Networks Publications, Inc. v. Ellis Graphics Corp., 959 F.2d 212, 214 (11th Cir. 1992)( "Of course, the court does not have to grant the motion for judgment notwithstanding the verdict, even though he thinks the original motion for a directed verdict should have been granted. This rule particularly provides that he may grant a new trial where justice would be served by it; where, for instance, it is obvious that the defect in proof of one side or the other is a thing that may be remedied at a new trial without perjury"); Goldsmith, 767 F.2d at 414 ("The discretion thus granted is addressed to the protection of the party whose judgment can be set aside to allow that the failure of proof, when only technical or when caused by error of the court or change in the law, be corrected."); 9A Wright & Miller, supra, § 2538 ("Thus the district court has discretion to order a new trial rather than grant judgment as a matter of law if it believes that the defect in the nonmoving party's proof might be remedied on a second trial, or if needed evidence was ruled out at trial by some error of the court.").

Although the Court finds that the Defendant is entitled to judgment as a matter of law on the trial record for the reasons set forth above, the Court finds that a new trial is warranted to avoid injustice.

With regard to the qualification issue, both the verdict form and the jury instructions were

inadequate in that they failed to inform the jury that, in the context of a claim of discrimination in promotion, to find that the plaintiff was "qualified for the position" it had to find that the plaintiff was "eligible for the position." The jury was asked to determine in the verdict form whether they found that Mr. Adams was qualified for the position of Lead P.A. [Doc. #90, at 2]. Counsel never sought a charge on the meaning of "qualified" or "eligible", and the court gave the jury no guidance on this subject.

Plaintiff argued that plaintiff was qualified for the position, citing his clinical skills and evaluations, seniority at the hospital and the affirmative action policy of the hospital. (Tr. 22-23). Defendant raised the departmental priority policy in summation (Tr. 62) but did not ask that the jury be instructed on the impact of this policy on the plaintiff's qualification, in terms of plaintiff's eligibility for the appointment. The failure to instruct the jury on the qualification/eligibility distinction likely caused the jury to give inappropriate consideration to the evidence that the hospital did not post the position after its requirements were revised so that Ms. Rienzo could accept it.

Likewise, the failure to provide the jury with any guidance for its consideration of the implications of the hospital's policy giving priority to departmental candidates is likely to have skewed the jury's consideration of the hospital's failure to re-post the job before awarding it to Rienzo.

Moreover, the case was tried with a primary focus on race discrimination and included plaintiff's contention that his transfer to the Department of Medicine was an adverse employment action. Until the race discrimination claims were dismissed at the conclusion of the evidence, the gender claim was less than precisely framed for the jury, particularly the question of whether the

15

plaintiff was eligible for the promotion in light of the willingness of Rita Rienzo to take the position, once it had been modified to remove the call requirement.

Finally, the legal theory that the hospital gave a preference to Rienzo on the basis of gender, as opposed to denying some benefit to plaintiff on the basis of his gender, was not articulated by the plaintiff in his requests to charge the jury, and no instructions were provided to the jury on the law they should apply in evaluating such a claim. Nor was the jury focused on the factual question of whether a position was crafted for Rienzo because she was female, or because she was perceived by Dr. Stahl as the only viable candidate for the Lead P.A. position in the department.

For all these reasons, while YNHH would be entitled to judgment as a matter of law on the trial record, the Court orders a new trial so that plaintiff may focus his presentation of the evidence on the gender discrimination claim and the Court, with the assistance of counsel, may provide the jury with comprehensive instructions which will facilitate the jury's consideration of the legal theories relied upon by both parties.

V.  **CONCLUSION**

The thorny issue presented by the post trial motions in this case is not the propriety of setting aside the jury's verdict. For the reasons discussed above, it is not supported by adequate evidence of a critical element of the claim - that plaintiff was "qualified " for the position awarded to Ms. Rienzo, as that term is defined in the relevant cases.  Rather, the close and difficult decision is whether plaintiff should have the opportunity to repair that lack of evidence at a new trial, or whether defendants are entitled to judgment as a matter of law.  On the current record, it is

16

questionable whether there is sufficient evidence to permit a jury to consider it. However, giving all benefit of the doubt to plaintiff, the Court in its discretion concludes that there may be evidence available which would enable plaintiff to meet the legal requirements for a case of gender discrimination, and that it is in the interest of justice to allow him to try. Based on an exhaustive review of the record, it appears that plaintiff and counsel concentrated their trial preparation and evidence on the claim of race discrimination, which was decided by the court at the conclusion of the evidence.

For the foregoing reasons, the court finds that a reasonable jury could not have concluded that Adams was the victim of gender discrimination, but that in light of the fact that the case went to the jury on the least litigated theory, it would be unfair to deprive the plaintiff of the opportunity to try the case again on the remaining gender discrimination claim. Plaintiff's gender discrimination claim will be retried. Accordingly, the defendant's motion for judgment notwithstanding the verdict and motion for a new trial [Doc. #91, 92] is DENIED IN PART AND GRANTED IN PART.

This is not a recommended ruling. The parties consented to proceed before a United States Magistrate Judge [Doc. #51] on December 14, 2007, with appeal to the Court of Appeals.

Entered at Bridgeport this 20th day of January 2011.

```
              /s/
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE
```